# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE ) | |
| VIVIAN J. CLEMENTE, ) | |
| DEBTOR ) | CHAPTER 7 |
| _____ ) | CASE NO. 07-42648-JBR |
| DAVID M. NICKLESS, TRUSTEE ) | |
| ) | |
| Plaintiff ) | |
| v. ) | AP. NO. 07-04160 |
| ) | |
| GERALD A. CLEMENTE, a.k.a GERALD ) | |
| CLEMENTE JR., AND MARTHA W. ) | |
| CLEMENTE ) | |
| ) | |
| Defendants ) | |

## MEMORANDUM OF DECISION

This matter came before the Court for trial on Counts I and II of the Complaint filed by the Plaintiff, David M. Nickless (the "Trustee"), alleging: a) that Vivian Clemente (the "Debtor"), fraudulently transferred her interest in 10 Culter Street (the "Cutler property") to the Defendant, Gerald Clemente, pursuant to Massachusetts General Laws Chapter 109A; and b) that the Debtor is the equitable owner in whole or in part of 9 Camden Avenue (the "Camden property"), which is currently owned by the Defendant, Martha Clemente. Having considered the testimony, demeanor, and credibility of witnesses, the following constitutes the Court's findings of fact and conclusions of law in accordance with the Federal Rules of Bankruptcy 7052.

<u>Count I - Fraudulent Transfer</u>

**FACTS:**

On May 11, 1989, the Debtor, the Defendant ("Gerald"), and the Defendant's brother ("Joseph") acquired title to the Cutler property as joint tenants with rights of

survivorship.[1] The Cutler property included a three family house located on the approximately 9,000 square foot parcel. In January 2003 the owners of the funeral home located next to the Cutler property sought to acquire a portion of the land behind the dwelling to use as a parking lot but no sale occurred at that time. By a deed dated March 4, 2003, the Debtor, Gerald, and Joseph transferred a portion of the Cutler property, described as "Lot 1 on a plan entitled 'Plan of Land in Worcester, MA, Prepared for: John J. Kazluaskas'" dated January 7, 2003, made by B & R Survey, Inc., recorded in the Worcester County Registry of Deeds in Plan Book, Plan, ("Lot 1") to Gerald and his wife, Teresa, as tenants by the entirety, for the stated consideration of $1.00 ("the First Deed"). That Deed, however, was never recorded. On May 23, 2003 Gerald alone signed a mortgage on the property in favor of CIT Group/Consumer Finance in the amount of $140,000. *See* Pl.'s Ex. 8. Gerald used the proceeds of this mortgage to pay off an existing mortgage, of which approximately $140,000 was outstanding; Gerald received no cash proceeds. Nearly six months later, on November 6, 2003, both the Debtor and Teresa executed the same document. *See* Pl.'s Ex. 8.

On January 7, 2004, Teresa died. On January 23, 2004, the Debtor, Gerald, and Joseph executed a quitclaim deed transferring all of the Cutler property, including Lot 1, to Gerald for stated consideration of less than $100.00 ("the Second Deed"). *See* Pl.'s Ex. 2. On the same date, Gerald executed a mortgage on the Cutler property in favor of Sherwood Mortgage Group, Inc. to secure repayment of a $151,000 note.[2] The Second Deed and the mortgage were recorded in Registry of Deeds on January 28, 2004.

According to the document styled "Plan of Land in Worcester, MA, Prepared for:

---

[1] Although there was no direct testimony that a mortgage was taken out to purchase the property, the Court infers that one was because the $140,000 mortgage taken out by Gerald on May 23, 2003 was used to pay off a prior mortgage.
[2] Neither the Trustee nor the Defendant proffered any evidence to explain the $11,000 increase in the mortgage note between May 23, 2003 and January 23, 2004.

2

John J. Kazluaskas dated January 7, 2003, made by B & R Survey, Inc." (the "Plot Plan"), the Cutler property was divided into two lots: Lot 1, the front portion of the Property, which was approximately 7,350 square feet and included the three-family house, and Lot 1A, an approximately 1,650 square foot parcel located at the rear of the property.  The Plot Plan was recorded at the Registry of Deeds on December 30, 2004.

On June 3, 2004, Gerald sold Lot 1A to the owners of the funeral home for consideration which, according to the deed, was $15,000.  *See* Pl.'s Ex. 10.  The Trustee asserts that the consideration was $20,000, of which $5,000 was an offset for funeral services rendered in connection with Teresa's death.  *See* Pl.'s Ex. 12.  On January 5, 2005, Attorney Simsarian disbursed the proceeds of the sale of Lot 1A.  According to the admitted evidence, $1,360.40 of the proceeds was used for title and recording fees, and Gerald received the balance of $13,639.60.  *See* Pl.'s Ex. 12.

On January 12, 2006, Gerald sold the property, minus Lot 1A, for $325,000.  *See* Pl.'s Ex. 3.  At some unspecified point prior to the sale, he refinanced the Cutler property with a $222,000 mortgage.  After paying the mortgage and closing expenses, Gerald received $93,000, of which neither the Debtor nor Joseph received any portion.  Gerald testified that $25,000 of the sale proceeds went into an escrow account for the real estate he purchased in Phillipston, MA.[3]  Gerald also testified that he used the remainder of the sale proceeds to "pay off existing debt," particularly debt incurred for home improvements made to the Cutler property such as, painting and repairing the apartments on the first and second floor, re-siding the property, and building a handicapped ramp for his son. He did not, however, provide an itemization of all the improvements.

---

[3] Based on the testimony that was heard and the evidence admitted, it is unclear when Gerald purchased the property in Phillipston, MA.

3

At some unspecified point in time, the Debtor started gambling. Although it is unclear, it appears that the Debtor's gambling precipitated the filing of her Chapter 7 bankruptcy petition on July 12, 2007. Documents she supplied to the Trustee and attached to the Trustee's Affidavit indicate that the Debtor received social security income of $13,339.20 in 2004; $13,694.40 in 2005, and $14,262.00 in 2006.

**DISCUSSION**

The Uniform Fraudulent Transfer Act (UFTA) is codified in Chapter 109A of the Massachusetts General Laws. Section 5(a)(1) of Chapter 109A provides that a transfer is fraudulent as to a creditor if made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Actual intent is commonly shown through circumstantial evidence and inference. To assess the transferor's actual intent, the Court must consider several factors, as set forth in section 5(b), such as whether:

> (1) "the transfer or obligation was to an insider";
> (2) "the debtor retained possession or control of the property transferred after the transfer";
> (3) the debtor "disclosed or concealed" the transfer;
> (4) the debtor was subject to or threatened with a lawsuit before the transfer was made;
> (5) "the transfer was of substantially all the debtor's assets";
> (6) "the debtor absconded";
> (7) "the debtor removed or concealed assets";
> (8) "the value of the consideration received . . . was reasonably equivalent to the value of the asset transferred";
> (9) "the debtor was insolvent or became insolvent shortly after the transfer was made";
> (10) "the transfer occurred shortly before or shortly after" the debtor incurred a "substantial debt"; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

M.G.L. ch. 190A, § 5(b).

Applying each of the foregoing factors to this case, the Court finds that the Trustee has not satisfied his burden of proof that the Debtor conveyed the Cutler property to her son, Gerald, with the actual intent to hinder, delay, or defraud creditors.

4

- Admittedly, the Debtor's transfer to her son was to an insider. However, the mere conveyance of property by a parent to a child, standing alone, is not conclusive of intent to defraud creditors. *See Chase v. Horton*, 9 N.E. 31 (Mass. 1886).

- At trial, the Debtor testified that she did not retain any possession, interest, or control over the Cutler property after transferring it to Gerald. In fact, the Debtor stated that the property was Gerald's, "to do whatever he wanted." The Trustee did not challenge or otherwise contradict this testimony. It is also undisputed that she did not reside at the Cutler property after the transfer.

- The evidence at trial and the Debtor's own testimony disclosed that the Second Deed was recorded in the Worcester District Registry of Deeds; thus, there is no question that the Debtor did not conceal the transfer.

- The Trustee proffered no evidence as to whether the Debtor was subject to or threatened with a lawsuit at the time of the transfer. On the contrary, the Debtor testified that she was current on all her obligations at the time of the transfer. Further, the Debtor's credit report (at least as of May 2007) indicates that she was "never late" on any of her credit card payments; therefore, the Court finds that she apparently had the financial wherewithal to satisfy her obligations.

- The Debtor testified that she maintained approximately $10,000 in savings and the Trustee submitted no evidence as to the value of the Debtor's car, jewelry, or any other assets as of January 2004. As such, it is uncertain whether the transfer of the Cutler property was a transfer of substantially all of the Debtor's assets.

- Because the Debtor has been residing at the Camden property with her other son, Joseph, there is no evidence that she absconded.

- The Trustee failed to introduce any evidence that the Debtor removed or concealed

5

her assets.

- Where, as here, there is an "intra-family transaction," the Court places a heavier burden on the transferee to establish fair consideration. *See Campana v. Pilavis (In re Pilavis)*, 233 B.R. 1, 11 (Bankr. D. Mass. 1999) (quoting *Pryor v. Fair (In re Fair)*, 142 B.R. 628, 631 (Bankr. E.D.N.Y. 1992)). To establish the adequacy of consideration, Gerald must demonstrate that the transfer was made in good faith and not in the "shadow of an imminent bankruptcy filing." *See Harman v. Sorlucco (In re Sorlucco)*, 68 B.R. 748, 754 (Bankr. D.N.H. 1986).

- There is simply no indication that the transfer occurred on the eve of bankruptcy because the Debtor did not file her bankruptcy petition until July 12, 2007, almost three years and seven months after the transfer date.

- The remaining question then is whether the transfer was made in good faith. The issue of good faith depends on whether the transaction carries the "earmarks of an arms-length bargain." *See In re Pilavis*, 233 B.R. at 11. Not only does the Second Deed reflect that the transfer was "in consideration of less than $100.00 dollars," *see* Pl.'s Ex. 2, but the Debtor also testified that there was no actual monetary exchange between her and Gerald. Furthermore, Gerald testified that he believed the Cutler property was worth $180,000 at the time of the transfer. With a $140,000 mortgage already encumbering the property, Gerald received approximately $40,000 in equity and provided nothing in return. While there is doubt that the Debtor intended to make a gift to her son, the Court cannot ignore that there was nothing arms-length about the transfer. Consequently, the Court concludes that the Debtor did not receive, in exchange for the property, any documented consideration of reasonably equivalent value for the Cutler property.

- The presence of a single badge of fraud raises a mere suspicion; the confluence of several badges, however, offers conclusive evidence of actual intent to defraud. *See Hasbro Inc. v. Serafino*, 37 F. Sup. 2d 94, 98 (D. Mass. 1999). Without additional badges of fraud to support the Debtor's intent, the lack of consideration in this case is not dispositive. *See id.*

- Any evidence supporting the Trustee's contention that the Debtor was insolvent or became insolvent shortly after the transfer is thin. While the unsecured claims itemized on the Schedule F correspond to the credit card balances reflected on the Debtor's credit report, those claims are accurate only as of April 2007. Relying on account balances that existed nearly three years and three months following the transfer date is hardly sufficient to establish the Debtor's insolvency at the time of the transfer. Recognizing the difficulties posed by this gap in the record, the Trustee instead relied on the "balance history," as identified in the Debtor's credit report. As a result, the Trustee ascertained that the Debtor's total unsecured claims amounted to approximately $33,800; notably, however, this information is only accurate as far back as May 2005, nearly one year and five months after the transfer to Gerald. Accordingly, the Court finds that such untimely data is not sufficient to assess the Debtor's insolvency at the time of transfer.

- There is also insufficient evidence in the record to determine whether the transfer occurred shortly before or shortly after the Debtor incurred a substantial debt. Despite the Trustee's assertion that the Debtor maintained a rolling balance on several credit cards prior to the January 2004 transfer, two of the five accounts (e.g., American Express account ending in 4702 and Bank of America account ending in 5416) identified on Schedule F came into existence well after the transfer date.

7

Relying on the Trustee's own calculations, these two accounts comprised approximately 63% of the Debtor's outstanding unsecured claims as of May 2005. Again, given the lapse of almost a year and five months, the Court cannot determine that the transfer occurred shortly before or after the Debtor incurred a substantial debt.

- Lastly, it is uncontested that the Debtor did not transfer any essential assets of a business to a lienor, who then transferred the assets to an insider.

Accordingly, the Court finds that the Trustee did not satisfy his burden on actual intent.

Section 5(a)(2) of the UFTA permits a creditor to set aside a transfer without regard to when the claim arose, provided that the transfer was made "without receiving a reasonably equivalent value in exchange for the transfer" and the debtor either (i) "engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small" or (ii) "intended to incur, or believed or reasonably should have believed that [s]he would incur, debts beyond [her] ability to pay as they became due."

As a threshold matter, the Court will first consider whether the Debtor received a fair value for her interest in the Cutler property. To determine reasonably equivalent value, the Court must consider all of the facts and circumstances of the case. *See In re Tri-Star Technologies Co.*, 260 B.R. 319, 325 (Bankr. D. Mass 2001). Accordingly, the Court must compare what was given with what was received, taking into account both direct and indirect benefits. *See id.* Although reasonably equivalent value does not require an exact exchange, the Court must consider the degree to which the Debtor's net worth was preserved. *See id.* As noted above, see supra discussion regarding 109A §

8

5(a)(1), the Debtor clearly did not receive reasonably equivalent value for the transfer. Moreover, the degree to which her net worth was preserved remained unclear since the Trustee did not definitively establish that she transferred substantially all of her assets.

The Trustee asserts that there was ample equity in the Cutler property as of the transfer date because Gerald sold Lot 1A for $20,000 in June 2004 and received an additional $93,000 when he eventually sold the property in January 2006. The Court, however, does not find the value of the property as of the January 2006 transfer date probative for three reasons. First, in assessing reasonably equivalent value, the Court looks to the value of the property as of the date when the Debtor transferred the Culter property to Gerald, not when Gerald transferred it to a third party. *See Grochocinski v. Eckert (In re Eckert)*, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008); *see also Pergament v. Reisner (In re Reisner),* 357 B.R. 206, 211 (Bankr. E.D.N.Y. 2006) (finding that reasonably equivalent value is determined as of the time of the underlying transaction). Notably, at trial, the Trustee neither contradicted nor challenged Gerald's testimony that he believed the Property to be worth $180,000 in January 2004. Second, general market appreciation contributed to the increase in property value. Without any additional evidence, the Court can neither guess the value of nor discount such appreciation. Third, the Court cannot ignore Gerald's testimony that he made significant improvements to the property such as, re-siding the property and remodeling the kitchen. While $25,000 of the 2006 sale proceeds went into an escrow account for Gerald's new home (in Phillipston, MA), Gerald testified that there was "nothing left," after paying all expenses, including the lien incurred for the home improvements. The Trustee also notes that, between January 2004 and January 2006, Gerald refinanced the property several times. In fact, Gerald testified that at some unspecified time he took out a $222,000 first

9

mortgage. Here, the Court finds that there is insufficient evidence to support Trustee's argument with respect to equity in the property as of the date that Gerald transferred it. Nevertheless, the Debtor did not receive reasonably equivalent value for the transfer of the property.

Even though the Debtor did not receive reasonably equivalent value for the transfer, the Court considers the remaining two disjunctive elements of section 5(a)(2). The Trustee neither alleged nor presented any evidence suggesting that the Debtor engaged in or was about to engage in a business or transaction for which her remaining assets would be unreasonably small. As a result, the issue before the Court is a narrow one: whether the Debtor believed or reasonably should have believed that she would incur debts beyond her ability to pay as they became due.

The Trustee sought to substantiate the Debtor's testimony that she periodically transferred balances between credit cards with the Debtor's credit report, evidencing that she maintained a rolling balance on several credit cards. However, the credit report failed to demonstrate what the Debtor's account balances were and her ability (or lack thereof) to satisfy those obligations as of or shortly after the transfer date. Moreover, the Court cannot ignore the Debtor's testimony that she was current on all her obligations at that time and that, over a two to three year period, she "zeroed-out" existing credit card balances by opening new cards. The Debtor also testified that, on a monthly basis, she receives a steady stream of income consisting of approximately $300 from her pension and an additional $1,100 from social security. Prior to the transfer, the Debtor received approximately $1,400 in rental income ($400 from each of her two sons and an additional $600 from a third tenant), which she applied towards other monthly expenses such as the mortgage, insurance, heat, and utilities. Following the transfer, the Debtor's expenses

were limited to assisting with rent, heat, and cable expenses at the Camden property, which varied on a monthly basis from $400 to $650. With a fixed stream of income and negligible expenses prior to and shortly after the transfer, the Debtor had no reason to believe that she would incur the $64,000 credit card debt that remains outstanding.

The only evidence that lends support to the allegation that the Debtor reasonably should have believed that she would incur such debts is her testimony that she "got caught in gambling." The Court, however, finds that this argument lacks merit. The Trustee failed to demonstrate that the Debtor was predisposed to gambling prior to the transfer. Nor did the Trustee elicit any testimony as to the time frame for the Debtor's gambling. Thus, without any evidence as to the frequency or dollar amount with which the Debtor gambled, the Court cannot conclude that the Debtor reasonably should have anticipated incurring debts beyond her ability to pay. Subsequently, the Court concludes that the Trustee has not satisfied his burden under section 5(a)(2).

Finally, section 6 of Massachusetts General Laws Chapter 109A provides that a debtor's transfer is fraudulent "as to a creditor whose claim arose *before* the transfer was made." As noted above, *see supra* regarding 109A § 5(a)(1), the Debtor's credit report did not identify even a single creditor with an outstanding claim at the time of the transfer. Although the creditor report discloses that the Debtor had several credit cards open, there is no evidence of any balances on those cards as of January 2004. Instead, the credit report only provides account balances dating as far back as May 2005, which is simply too far removed from the transfer date to determine whether there was an outstanding claim at the time of the transfer. Without any evidence of an existing creditor or that the Debtor's liabilities exceeded her assets as of the transfer date, the Court finds that the Trustee failed to satisfy his burden under section 6. *See Kerrigan v.*

11

*Fortunato*, 24 N.E.2d 655 (Mass. 1939); *cf. Fleet Nat. Bank v. Booth*, 2001 WL 292417 (Mass. Super. Feb. 28, 2001) (stating that the plaintiff must demonstrate that, at the time of the transfer, the debtor was unable to satisfy existing debts to support a finding of fraudulent conveyance).

<u>Count II – Equitable Title</u>

**FACTS:**

By a deed dated February 7, 2002, the Debtor transferred the Camden property to her daughter-in-law, Martha Clemente ("Martha"). The stated consideration for this transfer was $100. As of the transfer date, a $57,000 mortgage already encumbered the Camden property. Since the transfer, Martha refinanced the mortgage on the Camden property on three occasions, obtaining a $115,000 mortgage on February 15, 2002, a $135,000 mortgage on December 24, 2002, and a $143,000 mortgage on November 14, 2004. None of the proceeds from these refinancing transactions were shared with the Debtor.

After the transfer, the Debtor continued to reside at the Camden property. As part of the transfer, there was a mutual understanding between the Debtor, Martha, and Joseph that the Debtor would live with her son and daughter-in-law provided that they built an "in-law" apartment for her. Martha and Joseph paid approximately $43,000 for the construction of the apartment primarily by the February 15th refinancing of the property. To help contribute to household bills, the Debtor pays approximately $375 - $400 in rent and $90 for cable. Notably, there was no change in the Debtor's financial condition because she continued to make the same exact payments that she made when she was paying her own mortgage. Furthermore, the Debtor also contributes to the payment of the monthly oil bill as she does not have her own utilities.

**DISCUSSION:**

At the time the Debtor transferred the Camden property, she was living at that property with her son and daughter-in-law, Joseph and Martha. She continued to live there after the transfer. Because the Debtor's financial arrangement with respect to the Property has not undergone any discernable change since the transfer, the Plaintiff alleges that the Debtor retained equitable title to the Camden property and therefore, it is property of the estate.

Under Massachusetts law, a debtor holds an equitable interest under an oral express trust, or in the alternative, under a resulting trust or a constructive trust. *See Lassman v. McQuillan (In re Charles River Press Lithography, Inc.)*, 338 B.R. 148, 160 (Bankr. D. Mass. 2006). An express trust, often created by an oral statement, depends primarily on the manifestation of intent to create a trust. A party seeking to establish a trust need not use specific terminology; instead, the party must unequivocally intend that the estate vest in one person to be held in some manner or for some purpose on behalf of another. *See Ventura v. Ventura*, 555 N.E.2d 872 (Mass. 1990). Here, there is simply no indication that the Debtor created an express trust. Her intent is anything but unequivocal as she testified that she "gave" the property to her son and daughter-in-law because it is "better to do [so] when you are alive than when you are dead." The Trustee does not contend nor proffer any testimony that the deed to Martha, or any other written instrument, established an express trust between the parties. Therefore, if a trust exists, it is by implication of law.

Unlike an express trust, resulting and constructive trusts are remedial devices, imposed by courts. *See Lassman*, 338 B.R. at 160. A court may apply a constructive trust to avoid the unjust enrichment of one party at the expense of another only where the

13

transferee acquired the property in dispute (a) by fraud or (b) in violation of a fiduciary relation or (c) where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information. *See Kelly v. Kelly*, 260 N.E.2d 659, 661 (Mass. 1970).

The Plaintiff proved none of the criteria necessary to establish a constructive trust. First, the Trustee does not allege nor do the facts of this case indicate that Martha obtained the Camden property by fraud. In fact, the Debtor repeatedly stated that she "gave" the property to her daughter-in-law. Second, there was no evidence of a fiduciary relation between Martha and the Debtor. A fiduciary relationship does not arise simply because a conveyance is made between members of the same family. *See Kelly*, 260 N.E.2d at 661; *see also Meskell v. Meskell*, 243 N.E.2d 804, 807 (Mass. 1969) (stating that there is no fiduciary relation between family members even where the tranferee promised to hold the conveyed property in a trust). Instead, to determine the existence of such a relationship, the Court must focus on whether there was a "dependency in business, property, or financial matters." *See Collins v. Huculak*, 783 N.E.2d 834, 841 (Mass. App. Ct. 2003). In the instant case, there is no evidence that the Debtor ever relied on or placed her trust and confidence in Martha in important financial matters. *See Kelly*, 260 N.E.2d at 661. To the contrary, the Debtor stated that she "never discussed [her] finances with any[one]." Presumably the Debtor trusted her daughter-in-law, but it does not appear that she was dependent on her in business or property matters prior to the transfer. Finally, there is no contention that Martha used any information confidentially imparted to her by the Debtor for her own advantage and to the disadvantage of the Debtor. Without any evidence of fraud, breach of fiduciary duty or other misconduct, the Court cannot impose a constructive trust.

14

As a result, the Court limits its analysis to determining whether the imposition of a resulting trust is appropriate. A resulting trust arises presumptively where a person conveys property under circumstances that raise an inference that he does not intend that the transferee should retain the beneficial interest in the property. *See City of Springfield v. Lan Tamers, Inc.(In re Lan Tamers)*, 281 B.R. 782, 792 (Bankr. D. Mass. 2002); *Reilly v. Wheatley*, 68 F.2d 297, 299 (1st Cir. 1933). Where one purchases property and directs that it be transferred to another, the Court infers that the purchaser intended that the grantee should hold the property for the benefit of the purchaser. *See In re Moodie*, 362 B.R. 554, 561 (Bankr. S.D. Fla. 2007). The inference or presumption is to the contrary, however, when a parent conveys property to a child; rather, there is a presumption that a gift was intended. *See Nichols v. Edwards*, 16 Pick 62 (Mass. 1835). However, that presumption is weaker when the relationship involves in-laws and can be rebutted by the evidence. *See In re Jewett*, 2007 WL 1288740 at *5 (Bankr. D.N.H. May 2, 2007).

To rebut the presumption of a gift, Trustee must establish "full, clear, and decisive proof" that the Debtor intended for Martha to acquire title to the Camden property for the benefit of the Debtor and to hold it for her in a trust. *See Dwyer v. Dwyer*, 898 N.E.2d 504, 506 (Mass. 2008); *Cormerais v. Wesselhoeft*, 114 Mass. 550, 552 (Mass. 1874). A debtor's intent may be implied from the conduct of the parties to the transfer. *See Dwyer*, 898 N.E.2d at 506. Accordingly, the Court must look at the "indicia of ownership and not the form in which the property is held." *See In re Tougas*, 338 B.R. 164, 174 (Bankr. D. Mass. 2006). To the extent that a transferor "directs [the] management" of the property or "otherwise acts as an owner would act, especially with the transferee's acquiescence," there is sufficient evidence to rebut the presumption of a gift. *See In re Cunningham*, 2008 WL 2746023 at * 4 (Bankr. N.D. Ohio July 11, 2008) (citing

15

RESTATEMENT (THIRD) OF TRUSTS § 9, cmt. c (2003)).

For the following reasons, the Court finds that the conduct of the parties corroborates the fact that Martha held the property for the Debtor in a resulting trust.

- While there is no explicit showing that the Debtor conveyed the Camden property to Martha in order to preserve any interest that the Debtor had in the property, the Debtor's actions indicate that she retained a beneficial interest in the property.

- Although the Debtor testified that the property belonged to Martha and Joseph and that they could "do what they wanted" with it, the transfer was conditional. At the time of the transfer, there was an implicit understanding that Martha and Joseph would take care of the Debtor given their relationship. By her own testimony, the Debtor "agreed to sign the house over to" them provided that they construct an apartment for her on the second floor of the property.

- The evidence indicates that on February 15, 2002, Martha refinanced the Camden property for approximately $115,000. *See* Def.'s Ex. 13. From that loan, she used approximately $57,065 to "pay off the existing mortgage" and retained at least $43,000 for the construction of the in-law apartment. *See id.* Although the Debtor did not directly receive any proceeds from this refinancing, the Court cannot ignore the fact that a significant portion, if not all, of it was used for her benefit pursuant to the understanding with Martha and Joseph.

- Not only did the Debtor continue to reside at the Camden property, but she also retained sufficient control over it. *See In re Beatrice*, 277 B.R. 439 (Bankr. D. Mass. 2002) (finding that a debtor-father controlled property that he transferred for less than $100.00 to a trust for his children even though he used refinancing proceeds for the exclusive benefit of his children).

16

- Additionally, the Court finds that by contributing to household bills such as cable and heat, the Debtor reserved to herself a right to treat the property as her own.

- At trial, Martha testified that, "almost immediately" after the transfer, she assumed all the related household obligations including the mortgage, property taxes, water, and utilities. Notably, however, the Debtor continued to pay "rent" in an amount equivalent to her previous mortgage payment. By her own admission, she thought it was "only fair" that she continue to make the same mortgage payments because the first mortgage was her responsibility. *Cf. McGavin v. Segal (In re McGavin)*, 189 F.3d 1215, 1218 (10th Cir. 1999) (finding a resulting trust where the debtor resided in the home and paid bills).

- The Debtor's testimony that Martha and Joseph were free to sell the Camden property if they wished and that she would move into a "high rise" was very self-serving. There was no evidence that this was the "understanding" when she transferred the property. Instead, she qualified the transfer by requesting that they build an in-law apartment for her.

- The Court finds that the Debtor transferred the Camden property for no consideration. *See Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 264 (1st Cir. 2004) (evaluating lack of consideration in count for resulting trust).

- Moreover, as in *Dwyer v. Dwyer*, *see* 898 N.E.2d 504, 507 (Mass. 2008), the fact that the Debtor did not file a gift tax return declaring the transfer a gift only undermines the presumption that she intended to gift the property to Martha.

In conclusion, the Debtor retained the benefits and burdens of ownership because she remained in continuous possession and occupancy of the Camden property, using it as her primary residence before and after the time of the transfer. Accordingly, the Court

finds that the Debtor does have an equitable title in the Camden property. Therefore, judgment will enter declaring the Debtor as the equitable owner in part of the Camden property.

    A separate order will issue.

Dated: August 12, 2009            By the Court,

                                           */s/ Joel B. Rosenthal*

                                           _____
                                           Joel B. Rosenthal
                                           United States Bankruptcy Judge